## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### CASE NO.


JESSICA LYNNE PEREZ

      Plaintiff,

v.

EAGLE VIEW TECHNOLOGIES, INC.,

      Defendant.            /
_____

### COMPLAINT

Plaintiff, JESSICA LYNNE PEREZ ("Plaintiff"), by and through her undersigned attorney, sues Defendant, EAGLE VIEW TECHNOLOGIES, INC. ("Eagle View") and alleges as follows:

### INTRODUCTION

1.     This is an action for damages, declaratory, and injunctive relief by Plaintiff against Defendant Eagle View Technologies, Inc. for sex, race, disability and national origin discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, the Florida Civil Rights Act of 1992 ("FCRA") and the Americans with Disabilities Act (ADA).  This action also

involves this Honorable Court's supplemental jurisdiction to cover the intentional civil theft of Plaintiff's funds, as well as breach of contract, both written and verbal, and unjust enrichment.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, ADEA and Title VII. The Court's supplemental jurisdiction is invoked for the Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3.    Venue properly lies in this judicial district pursuant to 28 U.S.C. §1391(b), in that the Defendant maintains offices within this judicial district, carries on commerce with citizens of this judicial district at open places of business located within this judicial district and Plaintiff primarily worked for GE within this judicial district.

## PARTIES AND EXHAUSTION OF REMEDIES

4.    Plaintiff is a thirty nine year old female of Dominican Republican national origin, sui juris, and is a resident located in part of Volusia County, Florida.  Plaintiff has been diagnosed with PTSD, generalized anxiety disorder and major depressive disorder, agoraphobia with panic disorder and insomnia, and has a service dog which provides psychiatric services associated with the disabilities. At all times relevant to the case, Plaintiff was a remote employee that alternated

working for the Defendant between Volusia County Florida and El Paso County Colorado.

5. Eagle View Technologies, Inc. (hereinafter "Eagle View") is a foreign profit company that provides aerial imagery, data analytics and geographic information system mapping based in Bellevue, Washington and Rochester, New York. At all times material to the complaint, Eagle View maintained commercial operations within the state of Florida.

6. Plaintiff has complied with all conditions precedent to jurisdiction under Title VII, ADA and the FCRA in that she filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR") within 300 days of the unfair employment practices alleged in this Complaint; Plaintiff has filed this suit within 90 days of receiving a Right to Sue notice from the EEOC on October 20, 2023; and Plaintiff is filing this Complaint within the FCRA's four (4) year statute of limitations for the alleged discriminatory acts. Thus, all administrative prerequisites have been satisfied and this suit is timely filed.

## GENERAL ALLEGATIONS

7. On or about July 24, 2022, Eagle View posted an advertisement for a Pilot Operations Administrator position in a Facebook military group where

Plaintiff was a member advertising $40,000 annual pay. Plaintiff applied sometime at the end of July 2022.

8.     On August 8, 2022, Plaintiff interviewed and revealed that she was of Dominican Republic national origin and had been diagnosed with PTSD, generalized anxiety disorder and major depressive disorder, agoraphobia with panic disorder and insomnia, and has a service dog which provides psychiatric services associated with the PTSD.  Rather than a salary of $40,000.00, Plaintiff was offered only $18.00 per hour but promised 500 to 750 hours of overtime each year in order to make up for the low base pay.  Plaintiff found that local child services cost $18.00 per hours so if she did not receive overtime then she only making enough to cover child services for her young children.  Based upon the Verbal Agreement with Eagle View recruiter Stefanie Kazouri that she would receive substantial overtime hours, Plaintiff accepted the position the same day and started work on September 12, 2022.

9.     Plaintiff was told by Stefanie Kazouris during onboarding, and by Gwen Hargrave during training, that she could just enter her overtime hours through ADP after I handled after-hours communications. However, this did not occur.

10.    Later, this would be used to further harass me during on-call weekends when my hours were constantly changed. During training, a Pilot missed his flight and texted us around 5 am MST. I didn't see it. I wasn't scheduled to work until 7 am MST. Gwen was not happy and told me I needed to be more attentive to my phone all hours day and night. After this, I made sure I checked every notification and set up my phone to override silent and ring even for texts even during the night just in case. This proved beneficial when another Pilot missed his flight at 2 am MST and I was awakened when Gwen was not.

11.    During my employment with Eagle View Technologies DBA Pacific Fleet Aviation, (9-12-22), I was subjected to racist, discriminatory, prejudiced, & biased statements made frequently by my Supervisor Gwen Hargrave about employees from Eagle View India including Chief Operating Officer Nagib Nsar whom she described as an "incompetent" & "ineffective leader". When I attempted to defend them, suggesting it was a language barrier issue, she said, "Indians were incompetent at tech" & joked the team should move IT to China.

12.    I regrettably marked "Hispanic" & "Disabled" during the hiring process. She made racially motivated remarks against a well-educated, very qualified African Immigrant hired as Assistant Chief Pilot (Jonathan Chiansi). He was hired briefly onto the Pilot Operations Team in SEP2022 before being promptly fired sometime in OCT2022 & replaced with a less educated, less

experienced white Pilot named Joseph O'Donnell sometime in NOV 2022. Joseph O'Donnell has since resigned due to the toxic work environment. Gwen's racist statements against African American/Black employees "lazy", "unmotivated", & "incompetent" & claimed they "shirked" responsibilities & were "a waste" of money". She tried to get them fired & succeeded in getting the Asst Chief Pilot Jonathan Chiansi terminated. She eventually succeeded in getting Justin Buchanan (maintenance tech) fired. The Safety Team told me in a private meeting off the record that they knew unfair allegations were leveraged at Justin by members of Pilot Ops. I later realized her accusations were untrue & based on race, ethnicity, national origin, color, gender/sex, or age.

13.    Gwen made several ethnically prejudiced remarks about 2 Asian Pilots we hired, claiming they were "incompetent" & "wouldn't last". She made discriminating statements about our new Pilot Operations Specialist Harold Perez calling him a "bit of a slacker" & saying he seemed "slow" because he spoke with a slight accent & spoke "more slowly". She said this in front of me despite my last name also being Perez, & I am Hispanic. She knew my husband & kids were dual Mexican American citizens & I was from the Dominican Republic. After Harold & I were hired, Gwen & other team members attempted to speak "Spanish" or throw out Spanish "slang" in front of us which I seemed like distasteful cultural appropriation or treating us as if we weren't equally Americans.

14.    Gwen Hargrave discriminated against older Pilots (40s, 50s). She referred to them as "technologically disabled/handicapped" & said she "didn't know why they attempted to learn a new skill at their age".  She treated them unfairly from younger Pilots, being rude, impatient, & often booking them less nice hotels or not giving them a rental car - forced to share younger Pilots' cars. Pilot Robert "Bob" Purcell was particularly targeted by Gwen Hargrave. She admitted on recording to me in November (11/11?), she knew he'd be trouble from the beginning when he was hired (due to age). Once, she said she wouldn't hire older Pilots if it was up to her. She said, Bob Purcell was "a pain in her butt" & "he was too old to act like such a snowflake". This because he caught her lying over booking him a bad hotel & putting a younger Pilot in a nice hotel nearby, claiming it was a pricing decision. He took screenshots of the Concur app showing the prices of these hotels where she put him vs others to prove she was discriminating against him. He sent me a copy of those screenshots.

15.    Harold Perez and I were the lowest paid employees on the Pilot Ops Team. My male counterpart Harold Perez, Pilot Ops Specialist, & I were the only Hispanic/minority team members & paid less & differently than the other non-Hispanic team members. The non-Hispanic team members were salaried. We were hourly but worked the same hours/schedules, did the same tasks, & initially had similar responsibilities as salaried team members. The Company didn't want to pay

us overtime despite multiple team members admitting ON RECORDINGS (OCT/NOV) our roles were 24/7 On-call/On-duty positions & HR didn't set up our roles correctly. I have HR ON RECORDING 11-7-22 apologizing for our work schedules & pay which they admitted were ILLEGAL.

16.    On 11-10-22, HR stopped them from overworking Harold & I without proper compensation for the hours we worked, & we couldn't be required to be on call 24/7 so team guidance changed. NO attempt was made to compensate us for the hundreds of hours of free labor we'd been forced to give the company since mid SEP2022 even though I turned in a document tracking all the overtime hours I had never been compensated for.

17.    Tensions escalated between us & our supervisors. We weren't required to do their jobs for them now, so the non-Hispanic, salaried employees were back to being solely responsible to meet the criteria of their own roles, & they were upset. Over NOV & DEC2022, Harold & I experienced escalating RETALIATION & HARASSMENT from our immediate Supervisors: Gwen Hargrave, Pilot Ops Coordinator & Bradley Aselage, Pilot Ops Manager. i.e. Repeated public humiliation in team, division & fleet meetings, on public "call outs" with lies written in publicly shared SharePoint documents, giving more work to me than humanly possible to handle (12-5 to 12-9) while threatening termination if I got even 1 minute of OT, write ups for false allegations, blatant lies, (11-30/12-

7) etc. Amber Lee (HR) & Gwen attacked me verbally, gaslighting me 12-7-22 lying & saying I was warned 11-10-22 I wasn't meeting "criteria for my role" and at risk of termination.

18.     They invented issues with my childcare situation Dec 7th despite Gwen saying ON RECORDING 11-30 a "perk" of my employment was to not pay for childcare & be able to breastfeed. Gwen knew I had ADHD, & lied claiming I was "distracted" in meetings despite having proof I wasn't. She made up secret rules that changed arbitrarily from day to day just to get me in trouble. Gwen & Amber (HR) discriminated, gaslighted, harassed, retaliated, & then fired me 12-13-22 after 93 days of 300+ hrs. of free labor, psychological abuse & countless acts of escalating discrimination and retalitation.

19.     In the first 6 weeks, I was essentially on-call 24/7. Gwen Hargrave said she had worked 365 days per year for over two years. She said she was happy I was there to share the load. I enjoyed being a helpful, team player, and pulling my own weight.  Gwen Hargrave had done this job for 2 years with less than 10 Pilots and less than 10 aircraft and had worked 500-750 hours of annual overtime or more during her employment. They hired me to assist when they had about 15 Pilots. By the end of my time, I was handling 47 Pilots and more than 30 aircraft.

20.    I never once complained about all the text messages, phone calls, Slack messages etc. after-hours. I rarely had an opportunity to log in and clock in via ADP before handling an issue and I didn't worry about it at the time. Keeping in mind all the overtime I was expecting as the year(s) progressed, I felt like being a team player now would work out for me well later. In my mind, this was a great company, and I envisioned a long term, committed, mutually beneficial relationship for decades to come. I was naïve. My first on-call weekend was September 24-25, 2022, jointly with Gwen Hargrave. At first, I was told only to log my time when working at the laptop. I did. This resulted in just a couple of hours overtime for being on call Friday evening to Monday morning. Despite me being tied to my laptop, WIFI, phone, and cell signal the entire weekend, carrying my laptop with me, and needing to check Slack and texts and answer every call. I was told these were less busy weekends and I shouldn't expect much overtime. But my cellphone was going off from 4:30/5 am MST to almost midnight at times. I kept on. I did log my hours similarly on October 8-9, 2022, during my second on-call weekend. My third on-call weekend came October 22-23, 2022. On the third on-call weekend, Cynthia Silong was in charge as Gwen Hargrave went on vacation since Wednesday, October 19th, 2022. That Friday, we had 13 Pilots heading to training in St. George, Utah the next day October 22nd, 2022. I was told by Gwen Hargrave, prior to leaving, that the new hires needed to finish their

onboarding tasks before they could head to training. I didn't want to let anyone down. I worked 12 hours Friday with no breaks calling, texting, emailing nonstop to make sure all the Pilots had turned in their paperwork and completed their onboarding tasks before flying out.

21.    During our "Afternoon Delights" meeting on Friday afternoon, October 21st, 2022, Harold Perez and I were told by Director Cynthia Silong to log 8 hrs. each day while on-call. I said I wished I had known I could get paid this way for my other weekends on-call. Cynthia Silong seemed a little confused and said it was the least they could do as a show of appreciation for how hard our team works. I was thrilled. This was going to be 32 hours of overtime guaranteed each month. Now I could finally see where the promised overtime would come into play. She had also told us to log additional hours if our work went over 8 hrs. At the end of each weekend day, Pilots were landing and communicating in the Slack, and I was monitoring everything and responding, and realized too late I had missed the 8 hr. log out. I went over each day about an hour - or a little more. Despite this, I went to sleep Sunday night believing Monday morning Gwen would be pleased with my hard work and how well I handled everything. I planned to relay to her how well she had trained me to be able to handle so many fires efficiently.

22.     On Monday morning, Gwen Hargrave contacted me early and was very upset with me. In a sense she set me up. She asked me how the week and weekend had gone. Thinking she was referring to all the crises and fires the past week and weekend, I didn't want to sound like I couldn't hack it, so I said it wasn't too bad and I felt I had handled everything well. She said her boss (which would be Cynthia Silong) was very upset and saying I had too many hours and so she needed to delete hours from my timecard. She deleted 2.73 hrs. from my timecard. I felt my integrity was being questioned and I assumed Cynthia Silong had given the direction to us to log 8 hrs. and then had forgotten (she was absent-minded a lot) and complained to Gwen Hargrave about it. I reached out to Cynthia Silong via email thinking she thought I was wasting time on the clock. *Come to find out, Cynthia Silong was completely unaware of my hours. I discovered Gwen Hargrave had lied to me. I knew I had to watch my back carefully.*

23.     I was then told by Cynthia Silong and Gwen Hargrave, I could only log 4 hours overtime each weekend day I was on-call. I was crushed. If I had felt appreciated Friday evening, I felt destroyed Monday morning. I shared to Cynthia Silong the spreadsheet where I had kept track of over 50 days of working at Eagleview Technologies and how many hours my phone went off after hours. I pointed out I had not charged the company for thousands of dollars of overtime and yet they were coming after me for a 2.73 hours. Over and over, I was told,

"You just need to learn to triage better after hours". I kept saying, "How can I triage that which I do not know exists? I just want to be compensated for the triaging

24.    I contacted the labor board, and wages division, and a labor attorney to ask questions. Because I still loved my job, and didn't want anyone to get in trouble, I refused to disclose my employer at that time. I just wanted clarity on the legalities of being on-call. They confirmed my on-call weekends were legally defined as "on duty" for 56 hours each weekend and without being paid very much, this was illegal. Furthermore, they told me the team's requirement for me to be "on-call" 24/7 as an hourly employee, was also not legal. After going back and forth with Cynthia Silong and Gwen Hargrave about it in emails and recorded zoom meetings and trying to get something in writing about my job description, and work out issues with my salary, overtime, and on-call status, Cynthia Silong said I should reach out to HR.

25.    Also, Harold Perez and I were the only hourly employees on the team, and the rest of the team made more money and were salaried. They expected the two hourly employees to be team players like them, and make their lives easier, but no one seemed willing to ensure we were legally compensated. Knowing Harold Perez has a wife and daughter to provide for, and didn't want to lose his job, I knew I was in a better position to be able to speak up.

26.     I asked for a written job description at this point. No one had one for me. HR finally sent me a copy of the hiring ad I had responded to which they and Stefanie Kazouris admitted was very vague. I spoke with Cynthia Silong and Stefanie Kazouris separately, while recording, and confirmed how much overtime was expected and relayed what I had been told in salary negotiations. I uncovered more untruths. I also asked for something in writing about my on-call weekends and how I would be compensated. At the direction of Cynthia Silong, I emailed Amber Lee in HR and asked her to meet with me.

27.     After about a week, she asked me to meet with her and Gwen Hargrave on November 10th to clear the air once and for all. I was happy to do so. More than anything at this point, I wanted this all behind me. I was hating the tension it had caused and by now I was in tears most days at some point from the stress and how the team had begun to shun me. Amber Lee met with me and Gwen Hargrave on November 10th, 2022, and said I would no longer be responsible for anything after hours unless I was on-call for the weekend. I was then told, I would NOT be getting 4 hours per day on weekends on call anymore, and I should only log in 2-3 random times per day to check in and complete what needed to be done as quickly as possible. I was not to take my laptop with me anywhere anymore or worry about cell coverage. I was told I should not get anymore overtime during the week without a supervisor pre-approval except up to 30 min per day to finish tasks,

but I should attempt to limit this. Also, I should start getting a lunch break now. Up until this point, I was never given a lunch break and worked straight through, eating lunch at my desk each day if I had a chance to eat at all.

28.    I was told much of what I had been trained to do each day, was no longer part of my job description (*which I still didn't have)* and I should stop doing it immediately as this was something Gwen Hargrave or Cynthia Silong were supposed to be doing instead. I was doing "too much" apparently. I was then told at the end of the meeting, by Gwen Hargrave how amazing I was and how great I was, and how much she loved having me on the team and how she hoped this would bring clarity and she hoped this would all be behind us now. It was an emotional meeting for me. My family had just lost an expected $20k per year in that meeting, and yet at the same time, I had just gained my life back.

29.    Then, November 30th, 2022, Gwen Hargrave called me on zoom out of the blue, and told me not to talk but just listen. She was brisk and detached. She read me a Performance Improvement Plan (PIP). I had immediately started recording. It was full of untrue allegations against me as well as claiming on November 10th, I had been warned by HR I was not meeting the criteria expected of me and I had been told to improve my performance immediately. I was also informed I was no longer allowed to mute my microphone during meetings. One of the things I was being written up for was an email I had sent the Pilots on Thanksgiving Day via

the Outlook advance scheduling tool. I had written the email on my lunch breaks and other breaks, and after hours on my own time. It was from my family to them and theirs. It was a personal note of encouragement for the Pilots stuck in the field and dealing with low morale. I even created a list of all the places open for Thanksgiving dinner in the locations where our Pilots were to be stationed Thanksgiving day. I received an overwhelming response from the Pilots that weekend thanking me and telling me how much it meant to them. I'm talking about dozens of responses. I was shocked to be written up for this. It was spiteful and petty. No attempt had been made to even investigate when or how I had written and sent this email. I was accused of "*possibly*" wasting time on the clock during a busy short week. I was accused of "*possibly*" using overtime to write it. I was accused of "*possibly*" logging in on a weekend or holiday I wasn't scheduled to work. I was also accused of numerous other things that were untrue and could be disproven. *The way it was written was sheer speculation as no actual attempt was made to know or understand the facts*. I was accused of not doing tasks I had previously been verbally informed were not my job. I was criticized for the way I handled my on-call weekends after they changed it to checking in 2-3 times per day, and despite trying to do exactly as I had been told.

30.    I immediately contacted an attorney through LegalShield and sent back a rebuttal to Gwen Hargrave and Amber Lee the following day refusing to

sign. HR did not reach out to me despite revealing I had evidence the allegations were untrue. No investigation was ever made.

31.    At some point, I was advised yet again Gwen Hargrave and Amber Lee would be changing my on-call hours and pay. Now I would be expected to log in at 9 am, 12 noon, and 3 pm and only stay logged on for 30 minutes each time to complete whatever tasks needed to be done. This would amount to one hour thirty minutes each day while on-call for 3 hours overtime total for the 56 hour on-call weekends, and if I missed anything at all, I would be at risk of immediate termination. I brought up my concerns with this and was told again I just needed to learn to be more efficient and triage better.

32.    After this second meeting with Amber Lee and Gwen Hargrave, I was informed, on top of everything else I had to do that day and week, I had to sign the Performance Improvement Plan (PIP) and return it by the close of business day. Keep in mind, I was barely able to seek legal counsel the first time. This time, they ensured I would not be able to do so by ordering me to sign it by the end of the business day. During my short lunch break, I wrote a quick rebuttal and returned the Performance Improvement Plan (PIP) unsigned. This time, I did not hesitate to inform Amber Lee the Performance Improvement Plan (PIP) was full of lies and was unfair, discriminatory harassment initiated by my previous inquiry about illegal pay and hours. I described how my work environment had become hostile

and toxic and was causing me undue stress, anxiety, and mental harm. I also forwarded the email I had been working on to show them how the guidance from November 10th to log in 2-3 times per day on weekends (and hurry) was unreasonable and would lead to missed details and errors. *I know for a fact; Harold Perez has also expressed identical concerns multiple times about this guidance and believes it could be a safety issue.* I received no response. Gwen Hargrave once again canceled our weekly wrap up meetings.

33.     Despite being told by HR these should be weekly, we had only had one or two and she cancelled the rest since early November. I continued doing everything asked of me. I did not miss my deadline to send emails to correct the Expense Reports. I did not miss my deadline to turn in a detailed report on the Pilot Ground School trainings by 10 am Friday, December 9th, 2022. I updated all the Pilot addresses the same day and did not miss any other deadlines including the rebuttal/return of my PIP.

34.     I flew to Florida on Saturday, December 10th, 2022 with my psychiatric service dog and children. I had advised Gwen Hargrave I was going back to Florida to stay with my family for an extended time because my brother was terminally ill and because I could receive full support with all my children. This situation was going to provide me with nonstop, free childcare with family while I worked which I desperately needed if I was going to salvage my job.

35. On the morning of December 13th, she was angry because I booked two Pilots just 1 mile apart and expected them to share a car for a few hours until the other one could pick up his car. I reminded her she had said Pilots should share a car regardless of being in the same hotel or not and told her I booked them separate to save money as she had told me to do. She was silent. Around 10 am EST, Gwen sent me a message asking if I had completed all my designated tasks. I confirmed I had. I received an instant zoom call. Fired. According to Amber Lee and Gwen Hargrave, the company had decided to go in a different direction.

36. As of the date of the filing of the Complaint, Plaintiff has failed to receive compensation from Eagle View for overtime she worked for the Defendant totaling $9,458.64.

37. Plaintiff has satisfied all conditions precedent to bringing this action or these conditions have been waived or otherwise excused.

38. Plaintiff has retained the undersigned attorney to represent him in this action and is obligated to pay said attorney a reasonable fee for his services. Plaintiff requests said attorneys' fees as damages in this lawsuit.

### COUNT I: VIOLATION OF FCRA (NATIONAL ORIGIN DISCRIMINATION & DISABILITY)

39. This is an action for discrimination based upon national origin and disability discrimination under the FCRA.

40. Plaintiff reasserts the general allegations as set forth above in Paragraphs 1-38 and incorporates these allegations herein by this reference.

41. Defendant violated the FCRA by discriminating against Plaintiff based upon her national origin. age by terminating her without valid reasons other than their intent to "push her out" for national origin and disability discrimination and by stealing her earned overtime and then later terminating her without justification.

42. As a result of Defendant's violations of the FCRA in firing Plaintiff solely based upon her national origin and disability, Plaintiff has been both financially and reputationally damaged.

WHEREFORE, Plaintiff, JESSICA LYNN PEREZ, prays that this Court will:

a. Order Defendant, EAGLE VIEW TECHNOLOGIES, LLC, to remedy the national origin discrimination of Plaintiff by:

i. Paying appropriate back pay;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendant for compensatory damages;

c. Enter an order against Defendant for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 760.11(5), Florida Statutes.

## COUNT II: VIOLATION OF TITLE VII (NATIONAL ORIGIN DISCRIMINATION & DISABILITY)

43.    This is an action for discrimination based upon national origin and disability under Title VII.

44.    Plaintiff reasserts the general allegations as set forth above in paragraphs 1-38 and incorporates these allegations herein by this reference.

45.     Defendant violated Title VII by discriminating against Plaintiff based upon her national origin and disability by terminating her without valid reasons other than their intent to "push her out" for national origin and disability discrimination and by stealing her earned overtime and then later terminating her without justification.

46.    Defendant's discriminatory actions had the purpose and effect of denying the Plaintiff rights in connection with his employment with GE that employees outside his age were allowed to enjoy.

47.    As a result of Defendant's violations of Title VII, Plaintiff has been damaged.

WHEREFORE, Plaintiff, JESSICA LYNN PEREZ, prays that this Court will:

a. Order Defendant, EAGLE VIEW TECHNOLOGIES, LLC,, to remedy the national origin discrimination of Plaintiff by:

i. Paying appropriate back pay;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendant for compensatory damages;

c. Enter an order against Defendant for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 760.11(5), Florida Statutes.

## COUNT III: VIOLATION OF AMERICANS WITH DISABILITIES ACT (DISABILITY DISCRIMINATION)

48.   This is an action for discrimination based upon disability under the Americans with Disabilities Act (ADA).

49.   Plaintiff reasserts the general allegations as set forth above in paragraphs 1-38 and incorporates these allegations herein by this reference.

50.     Defendant violated ADA by discriminating against Plaintiff based upon her disability by immediately terminating her without valid reasons other than their intent to "push her out" for national origin and disability discrimination and by stealing her earned overtime and then later terminating her without justification.

51.     Defendants' discriminatory actions had the purpose and effect of denying the Plaintiff rights in connection with her employment with Defendant that employees outside his disability were allowed to enjoy.

52.     As a result of Defendants' violations of the ADA, Plaintiff has been damaged.

WHEREFORE, Plaintiff, JESSICA LYNN PEREZ, prays that this Court will:

a. Order Defendant, EAGLE VIEW TECHNOLOGIES, LLC, to remedy the of Plaintiff by:

i. Paying appropriate back pay;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendants for compensatory damages;

c. Enter an order against Defendants for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 760.11(5), Florida Statutes.

## COUNT IV: BREACH OF WRITTEN EMPLOYMENT CONTRACT

53. Plaintiff re-alleges the allegations contained in paragraphs 1-38 above.

54. Plaintiff and Defendant entered into a written agreement as described for his work.

55. Pursuant to the parties' agreement Defendant agreed to compensate the Plaintiff for all overtime as an hourly employee worked in compliance with state and federal rules. However, Plaintiff identified overtime hours totaling $9,458.64 wherein she was not compensated.

56. An essential term of the written agreement was that Defendants would pay Plaintiff according to the terms of said agreement and the federal and state laws.

57. Defendants have willfully failed to pay Plaintiff for worked previously performed by refusing to reimburse Plaintiff $9,458.64 in earned wages, commissions and other income from Plaintiff.

58. Plaintiff has been damaged due to Defendant willful failure to pay Plaintiff the appropriate agreed upon income.

59.     Pursuant to § 448.08, Florida Statutes, Plaintiff is entitled to costs of the action and a reasonable attorney's fee.

WHEREFORE, Plaintiff requests judgment against the Defendant for damages and prejudgment interest, together with costs of suit and reasonable attorney fees, and such other and further relief as the court may deem proper.

## COUNT V: BREACH OF ORAL EMPLOYMENT CONTRACT

60.     Plaintiff re-alleges the allegations contained in paragraphs 1-38 above. This count is alleged in the alternative to Counts IV and VI.

61.     Pursuant to the parties' agreement Defendant agreed to compensate the Plaintiff at the terms specified above in paragraphs 1-38.

62.     An essential term of the written agreement was that Defendants would pay Plaintiff according to the terms of said agreement.

63.     Defendants have willfully failed to pay Plaintiff by refusing to reimburse Plaintiff $9,458.64 in earned wages, commissions and other income from Plaintiff.

64.     Plaintiff has been damaged due to Defendant's willful failure to pay Plaintiff the appropriate agreed upon income.

65.     Pursuant to § 448.08, Florida Statutes, Plaintiff is entitled to costs of the action and a reasonable attorney's fee.

66.     An essential term of the oral agreement was that Defendant would pay Plaintiff according to the terms of said agreement.

WHEREFORE, Plaintiff requests judgment against Defendant for damages and prejudgment interest, together with costs of suit and reasonable attorney fees, and such other and further relief as the court may deem proper.

## COUNT VII – UNJUST ENRICHMENT

67.     Plaintiff re-alleges the allegations contained in paragraphs 1-38 above. This count is alleged in the alternative to Counts IV and V.

68.     As an alternative pleading to the allegations in Counts IV and V, Plaintiff gave Defendant benefits in the form of overtime hours as an hourly worker, but was not compensated fully for her services.

69.     Defendant has knowingly accepted these services from Plaintiff and never objected to the receipt of the same.

70.     Plaintiff objected to the purloinment of her overtime hours and repeatedly demanded the production of her earned income.

71.     The circumstances are such that it would be inequitable for Defendant to retain the benefits of Plaintiff's work without paying the value to her.  It is clear that it was not Plaintiff's intent to provide a gift of her labor to Defendant.

72.     Plaintiff has been damaged due to Defendant's willful failure to pay Plaintiff for all of her services. Defendant has willfully failed to pay Plaintiff for

worked previously performed. Prior to the commission of Discovery, a reasonable estimate of this loss is $$9,458.64 in earned wages, commissions and other income from Plaintiff that has been purloined from Plaintiff.

WHEREFORE, Plaintiff, JESSICA LYNN PEREZ, prays that this Court will:

a. Order Defendant, EAGLE VIEW TECHNOLOGIES, LLC, to remedy the unjust enrichment by:

i. Paying appropriate back pay including full reimbursement of the purloined commission;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendant for compensatory damages;

c. Enter an order against Defendant for punitive damages;

d. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 448.104, Florida Statutes.

## COUNT VIII: CIVIL THEFT

73.     Plaintiff re-alleges the allegations contained in paragraphs 1-38 above.

74.     Plaintiff submitted a written notice to Defendant's ownership clearly and expressly stating the civil theft that was occurring to Plaintiff's earned overtime.  This demand notice was submitted more than 30 days prior to the commission of the trial.  Moreover this submission also serves to provide notice of the civil theft more than 30 days prior to the commission of the trial.

75.     Defendant continues to abscond and hold Plaintiff's earned income.  These funds were stolen by Defendant in part for the benefit of its management team and ownership.

76.     Plaintiff has been damaged due to Defendant's willful failure to pay Plaintiff for all of her services.  Prior to the commission of Discovery, a reasonable estimate of this loss is $9,458.64 in earned wages, commissions and other income from Plaintiff that has been purloined from Plaintiff.

77.     Defendant is hereby notified more than 30 days before trial that Plaintiff will be seeking treble damages as well as prejudgment interest, together with the costs of suit and reasonable attorney fees.  The continued failure to abide by the demand letter and this notice provides express evidence of Defendant's

intent to knowingly and with felonious intent commit civil theft by absconding with money rightfully belonging to Plaintiff.

WHEREFORE, Plaintiff requests judgment against GE for treble damages and prejudgment interest, together with costs of suit and reasonable attorney fees, and such other and further relief as the court may deem proper.

### COUNT IX: VIOLATION OF FLORIDA'S PRIVATE WHISTLEBLOWER'S ACT

78.    Plaintiff reasserts the general allegations as set forth above in paragraphs 1-38 and incorporates these allegations herein by this reference.

79.    Florida Statute §448.102 (1) prohibits an employer from taking a retaliatory personnel action against an employee because the employee has "Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation."

80.    Florida Statute §448.102 (3) prohibits an employer from taking a retaliatory personnel action against an employee because the employee has "Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer."  Defendant continues to retaliate against Plaintiff by unlawfully withholding her earned

overtime.  This continual hold is being done to punish Plaintiff for filing the complaint of race and sex discrimination with the Equal Employment Opportunity Commission.

81.   Plaintiff's statutorily protected conduct under the FWPA was causally connected to Defendant's decision to continue to withhold her overtime.  Similarly, the decision to fire her after reporting the issue to the appropriate governmental agency is in stark violation of the FWPA.

82.   As a result of Defendant's violation of the FWPA, Plaintiff has been damaged.

WHEREFORE, Plaintiff, JESSICA LYNN PEREZ, prays that this Court will:

a. Order Defendant, EAGLE VIEW TECHNOLOGIES, LLC, to remedy the of Plaintiff by:

i. Paying appropriate back pay;

ii. Paying prejudgment and post-judgment interest;

iii. Paying front pay in lieu of reinstatement;

iv. Paying for lost benefits including medical insurance, pension and retirement plan;

v. Providing any other relief that is appropriate.

b. Enter an order against Defendant for compensatory damages;

c. Grant Plaintiff costs and a reasonable award of attorney's fees pursuant to Section 448.104, Florida Statutes.

e. Enter an injunctive order against Defendant ordering that they immediately rehire Plaintiff at her former position and pay rate.

## DEMAND FOR JURY TRIAL

Plaintiff, JESSICA LYNNE PEREZ, hereby demands trial by jury on all claims triable by right of jury under state or federal law.

Dated this 17th day of January, 2024

Respectfully submitted,

*Warren J. Pearson, JD*

Warren James Pearson, JD
3562 Four Oaks Blvd
Tallahassee FL 32311
Independent Co-Counsel with Marble Law
Counsel for Plaintiff
Telephone: (850) 567-6164
E-mail: warpear@gmail.com
Florida Bar No.: 0711578